# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### NORTHERN DIVISION

| | | |
|---|---|---|
| **CRYSTAL K. McFARLAND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 2:14cv0042 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. §§ 405(g) and 1383(c)(3) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Crystal K. McFarland (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

By decision dated October 4, 2011, an Administrative Law Judge (ALJ) determined that Plaintiff had not engaged in substantial gainful activity after October 1, 2008, and had severe impairments of degenerative disc disease of the thoracic spine and, probably,

fibromyalgia. (R.[1] at 100-09.) The ALJ concluded, however, that these impairments were not disabling and denied Plaintiff's applications for DIB and SSI. (Id.) Plaintiff applied for DIB and SSI again in December 2011, alleging she was disabled as of October 4, 2011, by irritable bowel syndrome (IBS), major depressive disorder, chronic fatigue syndrome, interstitial cystitis (painful bladder syndrome), osteoarthritis in her right foot, rheumatoid arthritis, degenerative disc disease, hypothyroidism, asthma, and anxiety. (Id. at 182-94, 235.) Her applications were denied initially and after a hearing held in September 2013 before ALJ Cynthia K. Hale. (Id. at 9-26, 36-70, 95-96, 114-15, 120-24.) Plaintiff then requested review of that decision by the Appeals Council and leave to file a new application while the request for review was pending. After considering submitted evidence, the Appeals Council denied both requests, noting that some of the documents had been before the ALJ and others related to a later time. (Id. at 1-5, 32.) The Appeals Council advised Plaintiff that she could use the date of her request for review as her disability onset date if she elected to file new DIB and SSI claims. (Id. at 2.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Abbe May, M.Ed., testified at the administrative hearing.

Plaintiff testified that she was then 47 years old, divorced, right-handed, and has no children under the age of 18. (Id. at 41.) She lives in a house with a man who is retired and

---

[1]References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

disabled.  (Id. at 42.)  She has no income of her own.  (Id.)  She graduated from high school and attended cosmetology school.  (Id.)  She has not worked as a cosmetologist for at least fifteen years.  (Id. at 43.)

Plaintiff last worked in 2008.  (Id.)  She left her factory job then because of her carpal tunnel syndrome and her other medical conditions.  (Id.)  Asked what her most significant medical conditions are, Plaintiff replied that they are her spine, back pain, and fatigue.  (Id.) She sees a nurse practitioner, a rheumatologist, and a urologist.  (Id. at 44.)  She was recently referred to an ear, nose, and throat (ENT) doctor.  (Id.)

Plaintiff described her worst pain as being neck pain and sciatic nerve pain that radiates through her legs, hips, and lower back.  (Id. at 46.)  To help relieve the pain, she takes Neurontin and lies down.  (Id. at 47.)  Also, her feet constantly hurt; her fingers are stiff, causing her to drop things; her sinuses hurt; and her ears bother her.  (Id.)

Plaintiff can sit for approximately twenty minutes before having to change positions, can stand for fifteen, and can walk for twenty.  (Id. at 48.)  She is not supposed to lift a lot and can lift only five to ten pounds.  (Id.)  She cannot put her arms above her head for long and has trouble rising up from a kneeling, crawling, stooping, or crouching position.  (Id. at 48-49.)  Her hands constantly hurt.  (Id. at 49.)  Her asthma causes her difficulties breathing.  (Id.)  Her feet swell and an injury to her left shoulder blade makes it hard for her to lift anything with that arm.  (Id. at 56-57.)  Because of fatigue, she has no energy.  (Id. at 58-59.) Her doctors have told her to try to keep moving and to start eating fruits and vegetables.  (Id. at 60.)  And, she is depressed and has been seeing a counselor.  (Id. at 49-50.)

Plaintiff does not smoke, drink, or take non-prescription drugs.  (<u>Id.</u> at 50.)

She has trouble sleeping because her bladder condition wakes her up during the night.  (<u>Id.</u>)  She sits on a stool when taking a shower.  (<u>Id.</u>)  She makes her bed and does light loads of laundry.  (<u>Id.</u> at 51.)  She cannot do other household chores.  (<u>Id.</u>)  She can go grocery shopping but has to leave if the store is crowded.  (<u>Id.</u> at 51-52.)  She has hot flashes and her heart races when she is in a crowd.  (<u>Id.</u> at 52.)

Plaintiff has a driver's license, but does not like to drive.  (<u>Id.</u> at 42.)  She attends church; the services are an hour long.  (<u>Id.</u> at 52.)  She can only read for short periods because her eyes get tired.  (<u>Id.</u> at 53.)  She takes care of a cat.  (<u>Id.</u>)  During a typical day, Plaintiff alternates between sitting in a recliner and lying down.  (<u>Id.</u> at 53, 55.)  She watches a little television.  (<u>Id.</u> at 55.)   She tries to exercise.  (<u>Id.</u>)  She naps for approximately forty-five minutes every day.  (<u>Id.</u> at 59.)

Ms. May was asked to assume a hypothetical claimant who is limited to light work and needs to alternate at will every forty-five minutes between sitting, standing, and walking.  (<u>Id.</u> at 64.)  She is restricted to only occasional interaction with the general public and can only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  (<u>Id.</u> at 65.)  She is not to climb ladders, ropes, or scaffolds.  (<u>Id.</u>)  She should avoid concentrated exposure to work hazards, smoke, fumes, and other irritants.  (<u>Id.</u>)  Ms. May testified that such a claimant can perform the work of a collator, laundry worker, and general office helper.  (<u>Id.</u> at 66.)  This claimant will be able to perform these jobs if she can only occasionally reach overhead and can frequently use her hands to grip, grasp, or handle.  (<u>Id.</u>)  If this claimant

needs to use the restroom briefly every hour, the jobs will not be affected.  (Id.)  If the claimant is limited to lifting and carrying no more than ten pounds and has to briefly move around every forty-five minutes, the jobs will still be appropriate.  (Id. at 66-67.)  The laundry worker and collator positions allow for sitting and standing at will.  (Id. at 67.)  The office helper position allows for a worker to move about freely.  (Id.)  If the claimant needs to be absent or leave work early two days a month, employment will be precluded.  (Id. at 67-68.)

If the claimant is limited to only occasional use of her hands to grip, grasp, or handle, the cited jobs will be eliminated.  (Id. at 69.)  If the claimant is off task for at least ten to twenty percent of the work day, the number of jobs will be less.  (Id. at 68.)

Ms. May stated that her testimony was consistent with the *Dictionary of Occupational Titles* (DOT).  (Id.)  The DOT does not refer to a sit/stand option; however, her experience as a rehabilitation counselor for twenty years informed her testimony about the freedom of movement allowed by the three cited jobs .  (Id.)

## Medical and Other Records Before the ALJ

The administrative record before the ALJ also included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from health care providers, and assessments of her physical and mental functional capacities.

On a Function Report, Plaintiff circled all the listed abilities as being adversely affected by her impairments:  lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, climbing stairs, seeing, remembering, completing tasks, concentrating, understanding, following instructions, using her hands, and getting along with

others.  (Id. at 250.)  She cannot walk for longer than five to ten minutes before having to rest for five.  (Id.)  She does not handle stress or changes in routine well.  (Id. at 251.)  She sometimes uses a cane, crutches, or walker.  (Id.)  The friend she lives with completed a Function Report on Plaintiff's behalf.  (Id. at 265-72.)  His answers generally mirror hers, with the exception that he did not list any use of crutches or a walker.  (Id. at 271.)  He and her mother separately completed questionnaires on Plaintiff's behalf.  (Id. at 284-86, 288-90.) Their responses to the questions, e.g., asking what problems prevent her from working and how long she can sit, stand, or walk, are consistent with the Function Reports and Plaintiff's hearing testimony.  (Id.)

Plaintiff's extensive medical records begin in April 2009 with those of John Barbagiovanni, D.O., of the Quincy Medical Group (QMG).  Plaintiff complained of occasional abdominal pain and diarrhea for the past three years that had become worse the past month.  (Id. at 440-41.)  He suspected IBS and was to review her medical records before making any treatment decisions.  (Id. at 441.)

On May 6, Plaintiff saw Ada Kagumba, M.D., with the QMG for complaints of severe pelvic pain, bloating, and dysuria (painful urination) for the past few years.  (Id. at 437-39.) Plaintiff was described as being "a difficult historian because she reported multiple symptoms and was unable to give a direct answer to any of the questions . . . asked her."  (Id. at 437.) Dr. Kagumba thought it unlikely that the small ovarian cyst revealed by a computed tomography (CT) scan was the cause of her pelvic pain.  (Id. at 439.)  A decision on medication was deferred to until Plaintiff saw another QMG physician, Kurt Leimbach, M.D.

which she did on May 18, complaining of pain in her neck, back, and right leg. (Id. at 419-21, 439.) Dr. Leimbach noted that Plaintiff "[c]omplain[ed] bitterly of pain from her head to her sacrum." (Id. at 419.) She had never had a magnetic resonance imaging (MRI) of her spine and was scheduled for one. (Id.) She was prescribed diltiazem, used to treat hypertension, and was to return after she had the MRI. (Id. at 420-21.)

Plaintiff returned to Dr. Leimbach on June 1. (Id. at 417-18, 446.) A CT scan of her chest was normal. (Id. at 417, 447.) The MRIs of her cervical, thoracic, and lumbar spines revealed mild degenerative changes with some spinal cord and nerve root compression. (Id. at 417, 448-50.) Also, she was having some dysuria. (Id.) X-rays of her abdomen showed no evidence of gastrointestinal obstructions. (Id. at 446.) She was to see a neurosurgeon for evaluation of her back pain, have a colonoscopy to investigate her complaints of diarrhea, have abdominal tests for complaints of bloating, have a urinalysis to investigate her dysuria, and be tested for antinuclear antibodies (ANA) to confirm her reports of a history of positive ANAs. (Id. at 418.)

Two days later, Plaintiff saw Dr. Barbagiovanni, who noted that Plaintiff's rheumatology workup appeared to be negative. (Id. at 436.) A colonoscopy was normal, with the exception of hemorrhoids. (Id.) An upper endoscopy was unremarkable. (Id.) Dr. Barbagiovanni recommended repeat examinations. (Id.)

On June 15, Plaintiff complained to Dr. Leimbach of back pain, palpitations, and gas/bloating. (Id. at 415-16.) She was to have endoscopies to investigate her gastrointestinal (GI) complaints and wear a Holter monitor to investigate her reports of palpitations. (Id.)

Plaintiff wore the monitor; the monitor revealed no complex ectopy (a disturbance of the cardiac rhythm).  (Id. at 430-35.)

When seeing Plaintiff on June 29, Dr. Barbagiovanni informed her that her stomach biopsy showed chronic gastritis.  (Id. at 425.)  He opined that her symptoms were related to chronic abdominal pain and IBS.  (Id.)  The next day, Dr. Leimbach informed Plaintiff that her ANA test was low positive and her echocardiogram was normal.  (Id. at 413-14.)  He reported that her palpitations were gone due to her current medication and her abstaining from caffeine.  (Id. at 413.)  Dr. Leimbach started Plaintiff on Savella, used to treat fibromyalgia.  (Id.)

In July, Dr. Leimbach saw Plaintiff and noted that she had gone to the emergency room for asthma and was now using an albuterol inhaler.  (Id. at 411-12.)  He was going to try to get her neurosurgical appointment moved up from its current setting in October.  (Id. at 411.)

On August 7, Plaintiff again saw Dr. Leimbach, complaining of worsening back pain and of right hip pain and explaining that she was no longer able to work because of the pain.  (Id. at 409-10, 445.)  X-rays of her right hip showed no acute osseous abnormalities.  (Id. at 445.)  He prescribed Skelaxin, a muscle relaxant, and referred her to a rheumatologist.  (Id. at 409.)

Four days later, Plaintiff went to Ernest Wallace, M.D., also with QMG, for her complaints of feeling bad and having palpitations and clammy feelings.  (Id. at 424.)  Also,

she was very fatigued.  (Id.)  Lab work was normal.  (Id.)  She was given a trial of prednisone and was to follow up with her primary physician.  (Id.)

On Dr. Leimbach's referral, Plaintiff saw a physical therapist, Kristin Shaffer, on August 13.  (Id. at 407-08.)  Plaintiff reported that she had been having occasional right hip pain since falling fifteen years earlier.  (Id. at 407.)  The pain was currently a six on a ten-point scale but could increase to a nine.  (Id.)  Plaintiff was to have physical therapy two or three times a week for four weeks.  (Id.)  Plaintiff did so, having seven sessions between August 13 and September 11.  (Id. at 399-400, 403-06, 426.)  After the September 11 session, Plaintiff did not schedule any further visits pending a follow-up appointment with Dr. Leimbach.  (Id. at 426.)  Aquatic therapy was recommended.  (Id.)

On August 28, while participating in physical therapy, Plaintiff saw Dr. Leimbach, reporting that her fibromyalgia symptoms were better on the Savella.  (Id. at 401-02, 444.)  She was advised to take the medication only once a day to avoid any side effects.  (Id. at 401.)  Also, she was having right ankle pain and random hot flashes.  (Id.)  An x-ray of the ankle showed degenerative changes.  (Id.)

Plaintiff consulted Dennis Ozment, M.D., a rheumatologist with QMG, on September 14.  (Id. at 396-98.)  Plaintiff reported she had been in good health until having a miscarriage fifteen years earlier.  (Id. at 396.)  After examining Plaintiff, Dr. Ozment concluded that her symptoms were related to fibromyalgia given the number of symptoms she had had for at least ten to fifteen years without developing crippling arthritis or end organ damage.  (Id. at 397.)  He agreed with the prescription for Savella and added Lyrica, also used in the

treatment of fibromyalgia.  (Id.)  Plaintiff was to call in two weeks and return in two months.  (Id.)

Plaintiff saw Dr. Leimbach the next day, complaining of side effects from the Savella.  (Id. at 394-95, 443.)  A CT scan of her abdomen revealed fatty infiltration of the liver; unremarkable kidneys, ureters, and bladder; and no acute inflammatory process of the abdomen or pelvis.  (Id. at 443.)  The Savella was stopped and Plaintiff was to call the next day to report whether her symptoms had improved.  (Id. at 395.)  Also, her urine was to be checked for causes of unspecified symptoms.  (Id.)

On Dr. Leimbach's referral, Plaintiff was seen on September 18 by Steve Rosen, P.A., with the QMG, for pelvic pain, abdominal bloating, and low back pain.  (Id. at 422-23, 442.)  Her symptoms and examination findings were suggestive of chronic cystitis.  (Id. at 422.)  A chest x-ray identified no active pulmonary disease.  (Id. at 442.)  She was to have a cystoscopy with hydrodistention of the bladder to rule out interstitial cystitis.  (Id. at 422.)

Plaintiff returned to Dr. Leimbach on October 14 for her complaints of abdominal pain, fatigue, fibromyalgia, and hypothyroidism.  (Id. at 392-93.)  He noted that Plaintiff could not tolerate the Savella and recommended that Lyrica be considered if she was not better within the week.  (Id. at 393.)  He prescribed amitriptyline for her fibromyalgia and for her IBS.  (Id.)

Two weeks later and four weeks after undergoing hydrodistention, Plaintiff consulted a urologist, Randall Dooley, M.D., with the QMG.  (Id. at 390-91.)  She reported some improvement on a medication, Elmiron, although she still had some urgency, frequency, and

dysuria.  (Id. at 390.)  Dr. Dooley recommended she continue on the Elmiron and return in three months.  (Id.)

Two days later, Plaintiff saw a neurosurgeon, Arden Reynolds, M.D.  (Id. at 386-89.) He described her complaints as being of "symptoms involving every part of her body including the roots of her hair.  There is not a single intervention that has been tried over the last decade which has not made matters worse and there has been a steady inexorable progression downward in terms of function."  (Id. at 386.)  Regardless, "she does not give a single description which is consistent with a neurologic origin of her pain."  (Id.)  Her illnesses included asthma, chronic fatigue syndrome, and hypertension.  (Id.)  He twice attempted a review of her symptoms, but Plaintiff gave a positive response to every question; consequently, he concluded that he could not vouch for the reliability of a review.  (Id. at 387.)  On examination, Plaintiff had normal muscle bulk and usual tender spots for fibromyalgia.  (Id. at 388.)  Straight leg raises were negative to 90 degrees bilaterally and there was no cervical or lumbar paravertebral muscle spasm.  (Id.)  She was oriented to time, place, and person with a normal remote and recent memory, but was depressed.  (Id.)  Her speech, attention span, concentration, gait, and motor examination were all normal.  (Id.)  A sensory exam was unreliable.  (Id.)  Dr. Reynolds assessed Plaintiff as having fibromyalgia, depression, and somatic preoccupation.  (Id. at 389.)  There was no evidence of neurologic dysfunction.  (Id.)  His recommendation was that there be as little intervention as possible because it would not be successful but would cause complications and "further her disability." (Id.)

The following month, Plaintiff consulted an Iowa neurologist, Nidal Alkurdy, M.D., and was diagnosed as "most likely [having] fibromyalgia and widespread muscle and probably some arthritic pain." (Id. at 321-22.) She was to be scheduled for a nerve conduction study of her right lower extremity. (Id. at 322.) Plaintiff cancelled the appointment for the study because she was waiting for disability to pay the coinsurance. (Id. at 323.) One week later, Plaintiff told Dr. Leimbach that a neurologist in Iowa had agreed with a diagnosis of fibromyalgia. (Id. at 384-85.) She appeared to be in better spirits. (Id. at 385.)

When seeing Plaintiff in December, Dr. Alkurdy noted that an MRI of Plaintiff's cervical, lumbosacral, and dorsal spine showed some spondylosis, "more prominently in the dorsal spine level." (Id. at 323.) Review of her symptoms was positive for sinus pain, palpation, swelling of her legs, shortness of breath, stomach pain, diarrhea, burning with urination, back and joint pain, and anxiety. (Id.) She was started on Neurontin. (Id. at 324.)

In January 2010, Plaintiff reported to Dr. Alkurdy that her symptoms had partially improved on her current medications with side effects of sedation. (Id. at 325.) He noted that she was being treated for interstitial cystitis with complaints of flank and abdominal pain, diarrhea, and burning with urination. (Id.) He referred her for physical and pool therapy and started her on Cymbalta in addition to her other medications. (Id.)

Two days later, Plaintiff reported to Dr. Dooley that the Elmiron was helping. (Id. at 376-79.) She was also taking gabapentin (the generic form of Neurontin) prescribed by a neurologist and would soon start taking Cymbalta. (Id. at 376.) She had complaints of

abdominal bloating, abdominal and back pain, and generalized malaise and fatigue.  (Id.)  She

had been diagnosed with fibromyalgia.  (Id.)  Plaintiff was to have a renal bladder sonogram

to determine whether there was any renal pathology causing her flank pain.  (Id. at 377.)  The

sonogram was normal.  (Id. at 379.)

When seeing Plaintiff in April, Dr. Alkurdy recommended that her Cymbalta dosage

be increased.  (Id. at 326.)

In May, Plaintiff reported to Dr. Alkurdy an overall improvement in her pain.  (Id. at

327.)  She was continued on her current dosage of Cymbalta.  (Id.)

Plaintiff returned to Mr. Rosen in July, reporting that the Elmiron was becoming less

effective.  (Id. at 373-75.)  Mr. Rosen described her urinary and pelvic pain symptoms as

stable and better on the medication.  (Id. at 374.)  She was to try Enablex, used to treat

symptoms of an overactive bladder, in addition to the Elmiron; was to look for dietary cues

for foods that exacerbate her symptoms; and was to return in six to eight months for a follow-

up appointment with Dr. Dooley.  (Id.)

The same day, Plaintiff saw Kelly Rife, A.P.N., with the Hancock County Health

Department, for complaints of chronic fatigue that had started gradually two years earlier,

"moderately limit[ed] [her] activities," and was exacerbated by stress and medication.  (Id.

at 330-31.)  Plaintiff also complained of diarrhea and back pain – the pain being constant;

moderate; exacerbated by prolonging standing or sitting, lifting, bending, and twisting; and

relieved by rest, recumbency, and nonsteroidal anti-inflammatory drugs (NSAIDs) – but had

no gait abnormality.  (Id. at 330, 331.)  Plaintiff also complained of depression, but not

anxiety. (Id. at 331.) She was diagnosed with diarrhea and unspecified myalgia (muscle pain) and myositis (inflamed muscles) and was to return in two weeks. (Id.)

Plaintiff did return. (Id. at 332-33.) She was to go on a gluten-free diet and was provided with paperwork to apply for assistance with paying for prescription medications as she was losing her Medicaid coverage at the end of the month. (Id. at 333.) The only diagnosis listed was diarrhea. (Id.)

When Plaintiff next saw Dr. Leimbach, on August 17, she reported having no chest pain, no abdominal pain, no dysuria, no neck or back pain, no muscle or joint pain, no difficulty sleeping, no anxiety or depression, and no paresthesia. (Id. at 370-71, 383.) She did have diarrhea. (Id. at 370.) Dr. Leimbach observed that she had mild chest wall tenderness, felt bloated, and was looking healthy. (Id. at 371.) She was to follow-up with her primary care doctor and was not scheduled for a follow-up with him. (Id. at 372.)

Five days later, Dr. Alkurdy saw Plaintiff for her complaints of pain, mainly in her toes and ankles and some swelling; no changes were made to her medications. (Id. at 328.)

In September, Plaintiff consulted Ms. Rife about the myalgia in her left hip and leg, feet, and back. (Id. at 334-35.) She had difficulty sleeping and took naps throughout the day due to fatigue. (Id. at 334.) She had shortness of breath with exertion and also complained of depression, weakness, a gait abnormality, and pain in her neck, shoulders, wrists, hips, legs, knees, ankles, and feet. (Id.) On examination, she was in distress secondary to pain and was tender at her right elbow, both wrists, and right thigh, lower leg, ankle, and foot. (Id. at

- 14 -

335.)  Plaintiff was started on prednisone.  (Id.)  Ms. Rife hoped to refer her to the Mayo Clinic if her medical coverage was reinstated.  (Id.)

In October, Plaintiff returned to Ms. Rife for treatment of her chronic, daily fatigue. (Id. at 336-37.)  She also complained of depression, paresthesia ("pins and needles" feelings), and neck and back pain, but denied chest pain and shortness of breath.  (Id. at 336.)  On examination, she had a normal mood and affect, was well-groomed, and had a normal gait. (Id.)  Weight loss and exercise were discussed.  (Id. at 337.)  She was diagnosed with malaise/fatigue and unspecified myalgia and myositis and was to return in three months.  (Id.)

Plaintiff returned in two months with complaints of chronic fatigue and back pain.  (Id. at 338-39.)  On examination, she was tender at her thoracic and lumbar spines.  (Id. at 339.) She was diagnosed with back pain and constipation and was encouraged to exercise.  (Id.)

Plaintiff again saw Ms. Rife in March 2011 for chronic fatigue, worse since she broke her ankle, and diffuse myalgia.  (Id. at 340-41.)  She was tender at her cervical spine and her right lower extremity.  (Id. at 341.)  Ms. Rife discussed with Plaintiff her fatigue being a likely side effect of her medication, but Plaintiff did not want to decrease the medication due to her chronic pain.  (Id.)  Her diagnoses were unchanged, with the exception of the fractured ankle being added.  (Id.)

Two weeks later, Plaintiff went to the Blessing Hospital Outreach Clinic (the Clinic) to establish care.  (Id. at 482-84.)  She named fibromyalgia and chronic fatigue syndrome as her diagnoses, for which she was not taking any medication.  (Id. at 482.)  Since having carpal tunnel release surgery, she had problems extending the fingers of her right hand.  (Id.)

She also had been told she has degenerative disc disease; hypothyroidism, for which she takes levothyroxine; and interstitial cystitis, for which she takes Elmiron and Enablex.  (Id.)  She had a fractured ankle from a fall four weeks earlier and was to follow up with a Dr. Wheeler in two weeks.  (Id.)  She had been using a treadmill for a total of twenty to thirty minutes a day until injuring her ankle.  (Id.)  She reported difficulty falling asleep during the day and staying asleep at night.  (Id. at 483.)  She thought she had low energy.  (Id.)  She also reported chest pain, palpitations, dyspnea with exertion, leg pain when she walked, diarrhea, bloating, indigestion, abdominal pain, urinary frequency, and multiple joint and muscle pains.  (Id.)  After examining Plaintiff, the clinician, Julie Barry, C.N.P., assessed her as having interstitial cystitis, hypertriglyceridemia, asthma with environmental allergies, chronic pain, and a fracture of the right ankle.  (Id. at 483-84.)  All but the fracture were by patient report.  (Id.)  Ms. Barry was to obtain Plaintiff's medical records, and Plaintiff was to return in four weeks.  (Id. at 484.)

Plaintiff returned six weeks later, on May 19, complaining of right knee and ankle pain, although she reported that a Dr. Wheeler had told her her ankle was healing well.  (Id. at 485-86.)  Also, she generally did not feel well.  (Id. at 485.)  On examination, she was alert, oriented, and in no acute distress.  (Id.)  She had no edema in any of her joints, a full range of motion, and an upright, steady, and unassisted gait.  (Id.)  An x-ray of her right knee was normal.  (Id. at 508.)  Lovastatin (to reduce levels of low-density lipoprotein (LDL)) was added to her prescriptions.  (Id. at 485.)

On June 1, Plaintiff saw Mr. Rosen for her complaints of increased lower abdominal discomfort and pressure and mild dysuria for the past few weeks. (Id. at 366-68.) She had right flank and chronic back pain and was having some mild increased frequency and urgency in urination. (Id. at 366.) She was to have a urinalysis and renal ultrasound and remain on Elmiron and Enablex in the interim. (Id. at 367.)

On June 21, Plaintiff complained to Ms. Barry of acid reflux, sinus problems, decreased vision, fatigue, and "multiple aches and pains, especially in her right hand, right groin, and back." (Id. at 487-88.) She had stopped taking the lovastatin because of side effects of muscle cramps. (Id. at 487.) Her dosage of Neurontin was increased; ranitidine (for treatment of ulcers and acid reflux) was added to her medications. (Id.) Ms. Barry had not yet received Plaintiff's medical records. (Id.)

Three days later, Plaintiff underwent a renal ultrasound to investigate her history of chronic interstitial cystitis; the ultrasound was normal. (Id. at 382.)

In August, Plaintiff consulted an opthamologist, Kevin Becker, O.D., with QMG, reporting that she was bothered by lights at night. (Id. at 364-65, 380-81.) She was diagnosed with allergic conjunctivitis, given eye drops to be applied once or twice a day, and was to follow-up in a year or two. (Id. at 365.)

One week later, Plaintiff saw Ms. Barry for complaints of multiple muscle pains, bloating, sleepiness, and nausea. (Id. at 489-90.) The examination findings were as before. (Id. at 489.) Her Neurontin dosage was reduced, and Plaintiff was to have an ANA panel drawn. (Id.)

Plaintiff was admitted to Blessing Hospital on September 1 after experiencing atypical chest pain. (Id. at 344-55.) Tests, including a chest x-ray, echocardiogram, and electrocardiogram, ruled out a myocardial infarction. (Id. at 344, 347-50.) The admitting physician, Malcolm Findlater, M.D., discussed with Plaintiff his opinion that an underlying anxiety disorder was causing the problem and recommended she discuss it with Ms. Barry. (Id. at 344.) Plaintiff was discharged home the next day. (Id.)

Plaintiff did see Ms. Barry the next week for joint stiffness, diarrhea, and dark, patchy spots on her right forearm and chin. (Id. at 491.) The relationship between Plaintiff's anxiety and her physical symptoms was discussed. (Id.) Plaintiff agreed to see a counselor, Claudia Lasys, M.S.W., L.C.S.W. (Id. at 491.)

When Ms. Lasys met with Plaintiff on September 14, she described her as presenting "with a fairly significant level of anxiety." (Id. at 492.) She found it difficult to distinguish between what had been diagnosed and what Plaintiff felt she had. (Id.) She noted that Plaintiff appeared to be willing to employ the strategies suggested to help lessen her anxiety, e.g., reducing her caffeine intake, but appeared to be more interested in talking about her health issues than in listening. (Id.) She also noted that Plaintiff reported she was not socially isolated, lived with her boyfriend, and "continue[d] to re-plead cases to attain a disability status." (Id.) Plaintiff was to return in two weeks. (Id.)

Plaintiff returned to Ms. Barry on September 22 for complaints of fatigue and an aching back and right foot. (Id. at 493-94.) Plaintiff's report of having an allergic reaction

to the Savella and Lyrica prescribed for fibromyalgia – not listed by Ms. Barry as a diagnosis – was to be investigated. (Id. at 493.) Her dosage of Cymbalta was increased. (Id.)

When seeing Ms. Lasys six days later, Plaintiff was described as "more calm, very lethargic." (Id. at 495.) She was oriented to time, place, and person; was "minimally cooperative"; repeatedly talked about how lethargic she was; and had a fairly labile affect (rapid shifts in emotion). (Id.) Ms. Lasys rated Plaintiff's Global Assessment of Functioning (GAF) as 50.[2] (Id.) Plaintiff's major concern was her pain and her disability claim. (Id.) She denied depression. (Id.) She was diagnosed with anxiety disorder. (Id.) On a scale of one to five, Plaintiff rated her anxiety as a two. (Id.) Ms. Lasys described Plaintiff as being "fairly resistant to any recommendations made." (Id.)

Plaintiff had a full range of affect when she saw Ms. Lasys on October 26. (Id. at 496.) Ms. Lasys worked with Plaintiff to shift her thinking about pain and what is wrong with her to what she can do, including physical therapy. (Id.)

Plaintiff reported to Ms. Barry on November 3 that the pain in her back and neck that had recently increased and she was suffering from nausea, vomiting, and bloating. (Id. at 497-98.) She had not yet received the increased dosage of Cymbalta. (Id. at 497.)

---

[2]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'"" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

Cyclobenzaprine, a muscle relaxant, was prescribed.  (Id.)  Ms. Barry found it to be unclear from Plaintiff's report which of two blood pressure medications she was taking, although she had not been prescribed either recently.  (Id.)

Plaintiff reported to Ms. Lasys on November 30 that she had benefitted from physical therapy, but the therapy sessions had not been rescheduled after the department had been bought out.  (Id. at 499.)  Ms. Lasys noted that this was the first time that Plaintiff had any positive remarks about her physical condition.  (Id. at 499.)  Plaintiff had no concerns about her anxiety levels and was to return as needed.  (Id.)

The same day, Plaintiff saw Mr. Rosen about her persistent urinary frequency and urgency.  (Id. at 361-63.)  She described her primary symptom as unchanged.  (Id. at 361.)  Her Elmiron dosage was continued; her dosage of Enablex was increased.  (Id. at 363.)  She was to return in four or six weeks.  (Id.)

Plaintiff reported to Ms. Barry on December 15 that she was using cyclobenzaprine only very occasionally and had not noticed any difference with the increased dosage of Cymbalta.  (Id. at 500-01.)  Plaintiff further reported that the physical therapy would temporarily help but the pain would return in a few days.  (Id. at 500.)  She was vague about why the therapy had ended.  (Id.)  Her Cymbalta dosage was decreased and Plaintiff was encouraged to take the muscle relaxant.  (Id.)  Plaintiff was referred to Dr. Espejo for pain management.  (Id. at 500, 513.)

When next seeing Mr. Rosen, on January 9, 2012, Plaintiff informed him she had not yet started taking the increased dosage of Enablex. (Id. at 478-80, 577-80.) She was to do so and return in four weeks. (Id. at 479.)

The next day, Plaintiff saw Dr. Barbagiovanni, complaining of constant diarrhea and pain and burning with bowel movements for the past few months. (Id. at 475-77, 573-76.) Her current medications included albuterol, amitriptyline, aspirin, cyclobenzaprine, Cymbalta, Elmiron, Enablex, hydrocortisone, levothyroxine, loratadine, Mag-Oxide, nabumetone (a NSAID), Neurontin, and Nexium. (Id. at 475-76.) Her height was 5 feet 7 inches; her weight was 230 pounds. (Id. at 476.) On examination, she was alert and oriented and did not appear to be in distress. (Id.) Rectal examination findings suggested dermatitis. (Id. at 476-77.) He suspected that her discomfort was related to a rash and prescribed an antidiarrheal medication, Lomotil. (Id. at 477.)

Plaintiff went to the emergency room at Blessing Hospital on January 30 for complaints of nausea, vomiting, and pain that was an eight on a ten-point scale. (Id. at 643, 645, 666-67.) On examination, she was alert and oriented to time, place, and person; was appropriate; and was not in acute distress. (Id. at 666.) An electrocardiogram showed nonspecific abnormalities. (Id. at 643.) An ultrasound of her lower extremities was negative for bilateral deep venous thrombosis and showed normal compression and augmentation. (Id. at 645.) Plaintiff was diagnosed with sinusitis and vomiting, treated, and discharged. (Id. at 667.) The emergency room course was described as "uneventful." (Id.)

In February, Plaintiff reported to Mr. Rosen that she had had no significant improvement in her urinary frequency and urgency on the increased dosage of Enablex. (Id. at 569-72, 647.) He described her urinary symptoms as being stable and unchanged over the past couple years. (Id. at 569.) The Enablex was returned to its original dose. (Id. at 571.) Plaintiff was to contact him after her gastrointestinal work-up. (Id.)

Plaintiff saw Maria Carolina Espejo, M.D., on March 6 for pain all over, fatigue, and weakness. (Id. at 686-90.) Dr. Espejo noted that she had seen Plaintiff in 2009. (Id. at 686.) Plaintiff reported that her pain syndrome was worsening. (Id. at 687.) On a scale from one to ten, her pain was a nine at its worst, a six to eight at its least, and currently a seven to eight. (Id.) She was applying for disability because she could not do anything without aggravating her pain. (Id.) Her back pain was aggravated by standing and walking and slightly relieved by lying down. (Id.) She thought the Cymbalta and Neurontin she took helped. (Id.) Her weight was 227 pounds. (Id. at 688.) On examination, her mood and affect were normal and she was oriented to time, place, and person. (Id.) She had diffuse tenderness in her cervical to lower lumbar spine on palpitation and was painful everywhere she was touched. (Id.) She had a normal range of motion in her hips and her lumbar and cervical spine, but reported discomfort on forward flexion. (Id.) Her muscle bulk, tone, and strength were normal in all extremities. (Id.) She had an antalgic gait from the right ankle fracture, but was able to toe and heel walk. (Id.) Straight leg raises and a Spurling test were negative. (Id. at 689.) Her abdomen was distended; her fingers were swollen but not warm. (Id.) Dr. Espejo put Plaintiff on a short-term course of prednisone. (Id.) She opined that Plaintiff's multiple

physical complaints could be attributed to her fibromyalgia and depression but wanted to make sure nothing more inflammatory was causing her symptoms. (Id.) She explained to Plaintiff that the consultation was for an evaluation and treatment and not for a disability evaluation. (Id.) Plaintiff understood. (Id.)

Plaintiff first reported to Ms. Barry when seeing her in April that the prednisone prescribed by Dr. Espejo had helped a lot and then said it had helped "maybe a little." (Id. at 584-85, 650-51.) She could not turn her head and her gums were bleeding. (Id. at 584.) On examination, she was alert and oriented, did not appear to be in acute distress, had an upright and steady gait, and had no joint edema. (Id.) An anti-inflammatory was prescribed and, as recommended by Dr. Espejo, a dermatology referral was made. (Id.) Ms. Barry noted that the referral would have to be in Peoria because Dr. Ozment did not want to see Plaintiff. (Id.)

Plaintiff was seen by Dr. Becker twice in May for refitting and adjustments to her contact lens. (Id. at 563-65, 566-68.)

At her June 5 visit, Ms. Barry noted that Plaintiff had no difficulty arising from a seated to standing position. (Id. at 586-87.) Plaintiff was encouraged to use an elastic ankle sleeve so she could walk and get exercise. (Id. at 586.) X-rays were to be obtained of her cervical and thoracic spines to investigate her complaints of back pain. (Id.) The x-rays of her cervical spine showed minor degenerative changes at C4-C5 and were otherwise negative. (Id. at 601, 652.) The x-rays of her thoracic spine showed minor degenerative spurring and were otherwise negative. (Id. at 601-02, 652-53.)

An MRI of Plaintiff's right ankle taken on June 13 showed mild tenosynovitis of the tibialis posterior; soft tissue swelling overlying the medial aspect of the ankle and a small amount of bone marrow edema within the medial aspect; osteoarthritis in the bone joint; and a plantar calcaneal spur and some adjacent thickening of the plantar fascia. (Id. at 603, 654.)

Plaintiff underwent a work-up by Sonu Dhillon, M.D., on June 19 to evaluate abnormal liver function tests. (Id. at 522-45.) Dr. Dhillon concluded that the underlying etiology of Plaintiff's "multiple medical complaints" was unclear. (Id. at 544.) He noted that her liver function tests had been normal in 2011 and had since modestly increased. (Id.) He opined that the cause was probably non-alcoholic steatohepatitis (NASH); active hepatitis was also a possibility. (Id.) Her liver function was to be continued to be monitored. (Id.) Her complaints of abdominal cramps, bloating, and diarrhea were probably caused by IBS with small bowel bacterial overgrowth being an additional problem. (Id.) An ultrasound of her abdomen revealed a fatty liver. (Id. at 640-41.) Plaintiff was prescribed amitriptyline, bentyl, and an antibiotic and was to return in three months. (Id. at 544.)

On June 24, Plaintiff had a work-up by Kathleen Voelker, N.P. at a Rheumatology Clinic for evaluation of symptoms Plaintiff described as having begun ten years earlier and being worse for the past three years. (Id. at 622-29.) On a scale from one to ten, her pain was a five to nine. (Id. at 623.) She had been diagnosed at the Mayo Clinic with hypothyroidism. (Id.) She wondered whether she had diabetes. (Id.) When questioned, Plaintiff answered "yes" to questions whether she could walk on flat ground, bend to pickup something, walk two miles, and had trouble sleeping. (Id. at 626.) On examination, Plaintiff had full strength

in her extremities, no tenderness or welling in her joints, no lack of range of motion, a good grip strength, and 18/18 tender points.  (Id. at 627.)  Ms. Voelker thought her symptoms were consistent with central sensitization or fibromyalgia.  (Id. at 628.)  She recommended water therapy and regular water exercise and regular, appropriate exercise.  (Id.)  She also recommended that her primary care physician consider Savella instead of Cymbalta.  (Id. at 629.)  Plaintiff was to return in two months to review lab work.  (Id.)

Ms. Barry encouraged Plaintiff on July 24 to continue with her exercise.  (Id. at 588-89.)

Plaintiff was seen at the Blessing Hospital emergency room in September and later that month by Ms. Barry for sinusitis and ear pain.  (Id. at 590-91, 672-75.)  Ms. Barry prescribed another antibiotic.  (Id. at 590.)

In November, Plaintiff consulted Ms. Barry about pain in her right leg for the past month that radiated from her back.  (Id. at 592-93.)  The injection given her in the emergency room[3] had helped for four or five days.  (Id. at 592.)  She was trying to exercise, but could do so only ten to twenty minutes at a time due to fatigue.  (Id.)  Also, she had problems with her left shoulder due to an earlier injury.  (Id.)  An x-ray was to be obtained, and when done showed minimal osteoarthritic changes without acute fracture or dislocation.  (Id. at 592, 604, 659.)  On examination, Plaintiff had equal strength in all extremities, a steady gait, and no pain on palpitation of her spine.  (Id. at 592.)

_____

[3]See Id. at 676-79.

Later that month, Plaintiff returned to Dr. Dhillon.[4]  (Id. at 546-54.)  Noting that the ultrasound had revealed a fatty liver, he concluded that Plaintiff's hepatic dysfunction was caused by NASH.  (Id. at 553.)  He further noted that the work-up for chronic liver disease was negative.  (Id.)  He encouraged her to lose weight[5] and to engage in moderate exercise.  (Id.)  He thought her nausea was related to the various medications she was taking for her other physical ailments.  (Id. at 554.)  Plaintiff was to return in six months.  (Id.)

The same day, Plaintiff complained to Ms. Voelker of fatigue, joint pain, and right hip, left shoulder, and back pain.  (Id. at 629-31.)  She was only doing water exercise every three months because there was no pool nearby.  (Id. at 629.)  She was to try Plaquenil.  (Id. at 630.)  If that was of no help with her hand pain and stiffness, it was to be assumed that her arthralia was related to fibromyalgia and the Plaquenil would be stopped.  (Id.)  On examination, she had good grip strength and no joint swelling in her extremities.  (Id. at 631.)

When examined by Dr. Becker in January 2013, Plaintiff had correctable visual acuity; she was to return in one year.  (Id. at 560-62.)

Plaintiff saw Ms. Barry at the end of the month for a variety of complaints, including that her right leg gave out on her after she walked approximately twenty minutes on a treadmill.  (Id. at 594-95.)  She had gained eight pounds.  (Id. at 594.)  On examination, she had a steady gait and equal strength in her extremities.  (Id.)  She was given exercises for stretching her shoulder.  (Id.)

---

[4]These records were also submitted to the Appeals Council.

[5]Her weight was then 221 pounds.  (Id. at 552.)

Plaintiff reported to Ms. Voelker on February 28 that the Plaquenil had not alleviated her hand pain. (Id. at 614-22.) And, she had more neck and back pain and fatigue. (Id. at 619.) She was walking for twenty minutes every day on the treadmill. (Id.) She was to be referred for physical therapy and for a sleep study, following which she was to return to the clinic. (Id. at 620.)

One month later, Plaintiff complained to Ms. Barry of fatigue and urinary frequency and burning. (Id. at 596-97.) She was referred to physical therapy. (Id. at 596.)

Consequently, she was evaluated for physical therapy on April 4. (Id. at 693-95.) Plaintiff wanted to focus on her neck pain. (Id. at 695.) She had a full range of motion in her lumbar and cervical spine with the exception of a 50 percent reduction in the rotation of her cervical spine to the left. (Id. at 693.) The goal was to increase it to 80 percent and decrease her pain level to a three. (Id.) The plan was for Plaintiff to have two visits a week for four weeks. (Id. at 693.) She had physical therapy sessions on April 9, 16, 23, and 30. (Id. at 698-705.) She was re-evaluated on April 30. (Id. at 706-08.) Neither goal had been achieved; it was recommended she continue with one visit a week for four weeks. (Id.) She had a session on May 7, 14, and 29. (Id. at 706-10, 722-24.) She was re-evaluated on May 29 and reported that she had been feeling "pretty good" until injuring her lower back in a fall the previous week. (Id. at 722-24.) Again, she was to participate in physical therapy once a week for four weeks. (Id.) At the second such session, on June 18, the rotation of her cervical spine to the left was 100 percent and her pain was a seven. (Id. at 727-29.) This was

the first change noted in the session reports. Plaintiff reported that her neck was doing "much better," but still had occasional pain in low back and right foot. (Id. at 727.)

During the period when she was doing physical therapy, she had a sleep study and was found not to meet the criteria for obstructive sleep apnea. (Id. at 605-07, 660-62, 682, 745-47.) The study did reveal snoring; weight loss was recommended.

Plaintiff saw Ms. Voelker on July 18, reporting that she had been seeing a counselor but was discharged after six weeks and "told to 'forget about her pain.'" (Id. at 731-40.) Ms. Voelker increased Plaintiff's vitamin D dosage, referred her to a pain clinic for consideration of injections, and advised her to seek counseling and to review a website about fibromyalgia to help her manage her symptoms. (Id. at 737.) Plaintiff was to return in three months. (Id.) MRIs of her lumbar and cervical spines taken at Ms. Voelker's direction were normal. (Id. at 739-40, 742-43.)

A CT scan taken on July 22 of Plaintiff's sinuses to investigate her snoring revealed minimal mucosal thickening with the left maxillary sinus and a mild nasal septal deviation of the mid nasal septum to the left. (Id. at 757.)

When seeing Plaintiff on July 31 for a follow-up, Ms. Barry scheduled her for counseling. (Id. at 751-54, 758-59.)

MRIs of Plaintiff's cervical and lumbar spines taken in August were normal.[6] (Id. at 742-43.)

---

[6]These records were also submitted to the Appeals Council.

Also before the ALJ were assessments of Plaintiff's mental and physical residual functional capacities.

In January 2012, a Disability Determination Explanation was completed at the initial level. (Id. at 71-94.) Kenneth Burstin, Ph.D., assessed Plaintiff's mental abilities. (Id. at 75-76, 87-89.) Her restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace were all mild. (Id. at 76, 88.) She had not had any repeated episodes of decompensation of extended duration. (Id.) Assessing Plaintiff's physical abilities, Natalie Kemna, a single decision-maker,[7] concluded that Plaintiff could occasionally lift twenty pounds, frequently lift ten, and stand, sit, or walk each for a total of six hours in an eight-hour day. (Id. at 77-78, 89-90.) She could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. (Id. at 78, 90.) She could not climb ladders, ropes, or scaffolds. (Id.) She did not have any manipulative, visual, or communicative limitations. (Id. at 78-79, 90-91.) She had environmental limitations of having to avoid concentrated exposure to vibrations, airborne irritants and poor ventilation, and hazards. (Id. at 79.)

This Explanation was reviewed in April 2012 by Phaedra Caruso-Radin, Psy.D., and M. Legarda, M.D., and affirmed. (Id. at 518-21.)

---

[7] See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

In May 2013, a psychiatric evaluation of Plaintiff was performed by Jeffrey Harden, D.O., at request of Clark County Division of Family Services. (Id. at 712-14.) Plaintiff reported that she was disabled by leg and back pain and by shortness of breath. (Id. at 712.) She occasionally suffered from depression caused by her worsening health. (Id.) She had spells of anxiety caused by specific fears or situations. (Id.) She was taking Cymbalta, but it was prescribed for her pain and not for her depression. (Id.) She could do some cooking, housecleaning, and shopping, but these activities were significantly limited by her pain. (Id.) On examination, Plaintiff had "a somewhat slow gait and maintained a somewhat stiff and uncomfortable posture apparently secondary to ongoing back pain." (Id. at 713.) She was cooperative and had a sad mood and logical thought processes. (Id.) Her insight and judgment were appropriate; her abstract thought and general fund of information were adequate; her concentration was poor. (Id.) She reported having mood swings triggered by stress and lasting between a few minutes to hours. (Id.) Dr. Harden diagnosed Plaintiff with recurrent major depressive disorder and generalized anxiety disorder with panic attacks. (Id. at 714.) Her GAF was 60.[8] (Id.) He recommended she see a mental health professional. (Id.)

_____

[8]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through December 31, 2014, and has not engaged in substantial gainful activity since October 5, 2011, the day after the previous adverse decision was entered. (<u>Id.</u> at 14.) She has severe impairments of obesity, history of interstitial cystitis, depression, anxiety, fibromyalgia, status-post carpal tunnel syndrome surgery with morning stiffness, and degenerative disc disease of the lumbar, thoracic, and cervical spines. (<u>Id.</u>) She also has a history of hypothyroidism, NASH, and asthma. (<u>Id.</u> at 15.) These impairments are not severe. (<u>Id.</u>) She does not have an impairment or combination thereof that meets or medically equals an impairment of listing-level severity. (<u>Id.</u>)

Addressing Plaintiff's mental impairments, the ALJ concluded that she has mild restrictions in her activities of daily living. (<u>Id.</u> at 16.) For instance, she prepares small meals, handles money, and attends church. (<u>Id.</u>) Her hygiene is not deficient. (<u>Id.</u>) She has moderate difficulties in social functioning. (<u>Id.</u>) She has limitations in interacting and relating with coworkers and the general public. (<u>Id.</u>) She also has moderate difficulties with regard to concentration, persistence, or pace. (<u>Id.</u>) She has not had any episodes of decompensation of extended duration. (<u>Id.</u>)

The ALJ next determined that Plaintiff has the residual functional capacity (RFC) to perform light work with limitations of lifting or carrying no more than ten pounds and of needing to alternate at will every forty-five minutes between standing, sitting, and walking without leaving her work station. (<u>Id.</u> at 17.) Also, she can occasionally balance, stoop,

kneel, crouch, crawl, and climb ramps and stairs, but should never climb ropes, ladders, or scaffolds. (Id.) She should avoid concentrated exposure to work hazards, e.g., moving machinery and unprotected heights, and to airborne irritants. (Id.) She should have no more than frequent use of her hands to grip, grasp, or handle and should only occasionally perform overhead reaching. (Id.) She needs to briefly use the restroom every hour. (Id.) She should have no more than occasional interaction with the public. (Id.)

In determining Plaintiff's RFC, the ALJ assessed her credibility. (Id. at 18-23.) After summarizing the information given by Plaintiff when applying for DIB and SSI, appealing the initial adverse decision, and testifying, the ALJ reviewed the medical records and found that Plaintiff's medical treatment had not significantly increased after October 4, 2011, and was limited to outpatient medication management and physical therapy. (Id. at 18-20.) She had not followed through on referrals to counseling. (Id. at 20.) The clinical signs and diagnostic findings did not support her subjective complaints. (Id.) For instance, in March 2012, she reported constant pain and weakness but was found to have a normal range of motion in her spine and hips, no swelling in her extremities, normal muscle bulk and tone, and a normal gait and station. (Id.) She had a steady gait the next two months also and no lack of range of motion. (Id. at 20-21.) She has not been found to have strength deficits in her extremities. (Id. at 21.) There was nothing in the record to suggest that her interstitial cystitis had significantly worsened since the previous decision. (Id.) And there was no evidence of any residual effects from her carpal tunnel release surgery. (Id.) Her weight had not significantly increased since March 2011, when she weighed 219 pounds. (Id.) She has

- 32 -

been found to have depression since at least 2009.  (Id. at 22.)  In 2012, she was found to have anxiety.  (Id.)  Regardless, no abnormalities in her mental status were noted by her treating physicians.  (Id. at 22.)

The ALJ noted that Plaintiff described fairly limited daily activities, but further noted that such could not be objectively verified and, even if accurately portrayed, the degree of their limitation could not be fairly attributed to her medical condition given the medical evidence and other considerations.  (Id. at 22-23.)

Next the ALJ noted the opinion evidence of the agency psychologist and of the single decisionmaker, but concluded that the evidence and Plaintiff's testimony suggested a more limited RFC.  (Id. at 23.)  For instance, the psychologist found only mild limitations and difficulties, but the evidence suggested at least moderate limitations in social functioning and in concentration, persistence, or pace.  (Id.)  The evidence also suggested a greater degree of limitation than found by the single decisionmaker in Plaintiff's ability to lift, sit, stand, walk, and use her hands.  (Id.)  The ALJ considered the supporting statements of Plaintiff's mother and friend,[9] but declined to give them significant weight because (a) the mother and friend are not disinterested third parties; (b) the accuracy of their information is questionable; and (c) the statements are not consistent with the preponderance of the evidence.  (Id.)

_____

[9]Although the ALJ refers to "friends" in the plural, there are supporting statements only by Plaintiff's mother and one friend, the gentleman with whom she lives.

With her RFC, Plaintiff cannot perform any past relevant work. (Id. at 24.) With her age, education, and RFC, she can perform other jobs that exist in significant numbers in the national economy. (Id. at 25-26.)

The ALJ concluded that Plaintiff is not disabled within the meaning of the Act. (Id. at 26.)

**Additional Records Before the Appeals Council**

When requesting review, Plaintiff submitted additional records to the Appeals Council, including those of a July 2013 visit to Dr. Douglas Phan, M.D., an otolaryngologist, for treatment of her recurrent sinus infection, a long history of hearing loss without ear pain or drainage, and snoring. (Id. at 769-73.) She was found to have normal hearing in each ear. (Id. at 771, 773.) Also normal were her gums, oropharynx, head, face, eyes, and neck. (Id. at 771-72.) She was to be rescheduled for a CT scan of her sinuses and was prescribed a daily nasal spray. (Id. at 773.)

Plaintiff returned to Dr. Phan the next month for "her sinus pressure issues" and to discuss the CT results. (Id. at 763-65.) He cleaned her left ear. (Id. at 764.) He noted that the sinus CT studies were normal and his ENT exam was negative. (Id. at 764.) He diagnosed her with chronic sinusitis and advised her to follow up with her primary care physician as needed. (Id. at 764-65.)

Plaintiff saw Ms. Barry in September. (Id. at 777-78.) She noted that Plaintiff had gained five pounds. (Id. at 777.) The examination findings were normal. (Id.) Plaintiff had

received Medicaid and wanted to see Heidi Ludwig, C.N.P., who her significant other saw. (Id.)  No follow-up appointment was scheduled.  (Id.)

Plaintiff saw Ms. Ludwig in October, reporting that she never feels well, is always tired, has chronic joint and back pain, and has fluid retention.  (Id. at 781-85.)  On examination, Plaintiff had a mild limp and slow gait and was tender in her thoracic and lumbar spines.  (Id. at 783.)  Her legs were swollen.  (Id.)  Otherwise, the findings were normal.  (Id.)  Ms. Ludwig was to obtain Plaintiff's medical records and consider referrals to two doctors (their speciality is not identified).  (Id. at 784.)  Plaintiff was prescribed bumetanide, a diuretic.  (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A"severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful

conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the

claimant to prove her RFC. **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). <u>See</u> <u>also</u> 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting <u>Hiller v. S.S.A.</u>, 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine

whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

**Discussion**

Plaintiff argues that the ALJ (1) failed to comply with Social Security Ruling 96-8 when assessing her RFC; (2) was patently erroneous when assessing her credibility; (3) failed to comply with the Commissioner's policies regarding fibromyalgia; and (4) improperly relied on the VE's testimony.  The Commissioner disagrees.

Plaintiff's RFC.  The ALJ determined that Plaintiff has the RFC to perform light work with limitations of lifting or carrying no more than ten pounds and of needing to alternate at will every forty-five minutes between standing, sitting, and walking without leaving her work station.  She can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but should never climb ropes, ladders, or scaffolds.  She should (a) avoid concentrated exposure to work hazards, e.g., moving machinery and unprotected heights, and to airborne irritants; (b)  have no more than frequent use of her hands to grip, grasp, or handle and only occasionally perform overhead reaching; and (c) have no more than occasional interaction with the public.  She would hourly need to briefly use the restroom.

"Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the *least* an individual can do despite his or her limitations, but the *most*." S.S.R. 96-8p, 1996 WL 374184, *2 (S.S.A. July 2, 1996) (footnote omitted). "[S.S.R. 96-8p] cautions that a failure to make [a] function-by-function assessment [of a claimant's RFC] could 'result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting S.S.R. 96-8p, 1996 WL 374184, *1). An ALJ does not, however, fail in her duty to assess a claimant's RFC merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Id.** Instead, an ALJ who specifically addresses the areas in which she found a limitation but is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68. See **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ does not fail in duty to fully develop the record by not providing "an in-depth analysis of each piece of record").

Plaintiff correctly notes that her medical history is complex. And, it is detailed. What it is not is supportive of a more restrictive RFC than the ALJ found.

The date at issue is October 5, 2011. Plaintiff was treated for the impairments she cites as disabling before then. For instance, she began treatment in April 2009 for IBS, which she described as having existed for the past three years. In May 2009, she was treated for pelvic

pain, bloating, and dysuria. The same month, she was treated for neck, back, and leg pain.

In June 2009, she was treated for, among other things, palpitations and abdominal pain. The

same month, she began treatment for fibromyalgia. In July 2009, she was treated for asthma.

In August 2009, she was treated for, among other things, fatigue and right ankle and hip pain.

In September, she began treatment for interstitial cystitis. In October 2009, she was treated

for hypothyroidism and depression. Plaintiff sought treatment forty-three times between April

2009 and October 2011 from a total of nine physicians, one physician's assistant, and two

nurse practitioners. From October 2011 to October 2013 – the date of the ALJ's decision –

she sought treatment twenty-six times, including twice for contact lenses, once for an annual

eye exam, and twice for ear pain. In the majority of the remaining twenty-one times, her

condition was often described as stable and she was advised to exercise – a recommendation

inconsistent with a more restrictive RFC.

Plaintiff argues that additional medical records must be considered when reviewing the

ALJ's RFC determination. Those records were submitted to the Appeals Council in support

of her request to be allowed to file a new claim.[10] Plaintiff's one-sentence summary of each

record fails to establish error in the RFC determination.[11] The regulations provide that "[i]f

---

[10]Plaintiff represents that the records include November 2013 Blessing Hospital records; November 2013 QMG records; December 2013 QMG records; December 2013 records of Dr. Espejo; December 2013 records from Dr. Barbagiovanni; January 2014 Blessing Hospital records; and January 2014 records of Elizabeth Stumpf, C.N.P.

[11]The summary is all that is available to the Court. Although Plaintiff states that the cited records are attached to her brief, they are not. Cf. **Whitney v. Astrue**, 668 F.3d 1004, 1007 (8th Cir. 2012) (remanding to district court for consideration of whether new evidence was properly submitted to Appeals Council when evidence at issue was submitted to district court).

new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §§ 404/1970(b), 416.1470(b). Plaintiff's summary of the records, see note 11, supra, fails to carry her burden of showing the ALJ erred. See **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010) ("[T]he burden of persuasion to prove disability and demonstrate RFC [is] on the claimant."). For instance, one record is of test results which, according to Plaintiff's summary, were not hemodynamically significant. Another record is for treatment of her NASH. As noted by the ALJ, Plaintiff had a history of treatment for NASH. See **Whitman v. Colvin**, 762 F.3d 701, 709 (8th Cir. 2014) (affirming denial of remand based on two records submitted to Appeals Council which were partially cumulative and not probative of applicable time period).

Plaintiff further argues that the ALJ erred by not considering the effect of her obesity on her ability work, as required by Social Security Ruling 02-01p. The ALJ noted that, although there is no medical listing for obesity, the regulations require "any additional and cumulative effects of obesity" be considered. (R. at 15.) She later noted that Plaintiff's Body Mass Index (BMI) was such that she was obese and, being guided by Ruling 02-01p, considered the combined effects of her obesity. (Id. at 22.)

Under Social Security Ruling 02-1p, obesity is to be considered "a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." S.S.R. 02-01p, 2000 WL 628049, *4 (S.S.A. Sept. 12, 2002). "There is[,

however,] no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment." Id. The regulations provide that:

> [o]besity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpart P, Appx. 1, § 1.00(Q).

In **Myers v. Colvin**, 721 F.3d 521, 527 (8th Cir. 2013), the Eighth Circuit rejected an argument that the ALJ erred by failing to consider the claimant's obesity and breathing limitations when determining the claimant's RFC. As in the instant case, the ALJ had included obesity among the claimant's severe impairments. **Id.** at 523. His RFC determination limited the amount of weight the claimant could lift and the length of time during an eight-hour day when she could stand and walk. **Id.** at 526. In **Heino v. Astrue**, 578 F.3d 873, 881 (8th Cir. 2009), the Eighth Circuit recognized its previous holding "that when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal." The court then rejected the claimant's argument that the ALJ had failed to consider her obesity when determining her RFC. **Id.** See also **Green v. Astrue**, 2011 WL 749743, *20-21 (E.D. Mo. 2011) (finding that ALJ properly considered claimant's

obesity by considering all her medical records and symptoms in light of obesity and concluding that impairments did not meet requirements of listing).

In the instant case, the ALJ found Plaintiff's obesity to be a severe impairment, cited Social Security Ruling 02-1p, limited the amount of weight she can lift, and limited the frequency of certain exertional activities, e.g., stooping and kneeling. In the instant case, this is sufficient to avoid reversal. See **Yarbrough v. Astrue**, 2012 WL 3235747, *3-4 (E.D. Ark. 2012) (finding that ALJ's citation to Social Security Ruling 02-1p, his statement that he had to consider at step three whether the combination of claimant's impairments satisfied a listing, and summary of alleged impairments, including obesity, satisfied requirement that ALJ consider combined effect of impairments, including obesity).

Plaintiff next argues that the ALJ erred by not inquiring about why she did not pursue counseling or about whether mental health treatment would have restored her ability to engage in substantial gainful activity (SGA), as required by Social Security Ruling 82-59. A failure to seek mental treatment may be considered by an ALJ when evaluating whether a claimant has a debilitating mental impairment. **Partee**, 638 F.3d at 864. See also **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (finding no error in consideration by ALJ of claimant's limited treatment record). Such consideration does not violate the requirement of Social Security Ruling 82-59 that a determination "be made as to whether [a] failure to follow prescribed treatment is justifiable" "*only where*," among other criteria, "[t]reatment which is *clearly* expected to restore capacity to engage in any SGA (or gainful activity, as appropriate)

has been prescribed by a treating source." Social Security Ruling 82-59, 1982 WL 31384, *1 (S.S.A. 1982). There is no such determination in Plaintiff's case.

      <u>Credibility.</u> Plaintiff challenges the ALJ's credibility determination as fatally flawed because she (a) did not describe or discuss the supporting statements of Plaintiff's mother and friend and (b) gave reasons not supported by the record as a whole.[12]

      Although the observations of third-parties may support a claimant's credibility, see 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (listing information from other people about a claimant's pain or other symptoms as a factor to be considered when evaluating a claimant's credibility), the responses at issue generally echoed the statements in Plaintiff's report about her symptoms and their effects. In **<u>Buckner v. Astrue</u>**, 646 F.3d 549, 559-60 (8th Cir. 2011), the Eighth Circuit held that an ALJ's failure to specifically address supporting claims by the claimant's girlfriend about his condition when those statements could be discredited for the same reason as had the claimant's statements was not error. In the instant case, the ALJ specifically addressed the third party statements and gave her reasons for discrediting them. There is no error. <u>Cf.</u> **<u>Willcockson v. Astrue</u>**, 540 F.3d 878, 881 (8th Cir. 2008) (finding ALJ's failure to refer in his decision to three supporting statements by claimant's family members was "another reason" for remand as it could not be determined whether ALJ "overlooked statements, gave them some weight, or completely disregarded them"). <u>But</u> <u>see</u> **<u>Robinson v. Sullivan</u>**, 956 F.2d 836, 841 (8th Cir. 1992) (declining to remand case in which

---

[12]In support of this argument, Plaintiff refers to records she describes as being attached but are not. Those references will be disregarded.

ALJ failed to list reasons for discrediting third party's statement when omission had no bearing on outcome).

Plaintiff contends that the reasons given by the ALJ for discrediting her complaints are not supported by the record as a whole; the Commissioner counters that they are.

One reason given by the ALJ is the lack of supporting objective evidence. This is a factor, although not one to be relied on solely, that may properly be considered. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008). For instance, Plaintiff complained of back and right leg pain, but consistently had a steady gait and normal muscle tone and strength. Diagnostic tests revealed, at worst, only mild degenerative changes. She complained of finger stiffness, but had normal grip strength. She complained of left shoulder blade pain, but had equal strength in both shoulders. See **Kamann v. Colvin**, 721 F.3d 945, 951-52 (8th Cir. 2013) (affirming ALJ's credibility finding based on discrepancies between claimant's self-reported limitations and observed capacities). The ALJ also noted the conservative treatment, i.e., outpatient medication management and physical therapy. This is a proper consideration. **Gowell v. Apfel**, 242 F.3d 793, 796 (8th Cir. 2001) (conservative treatment supported ALJ's adverse credibility determination); **Black v. Apfel**, 143 F.3d 383, 386 (8th Cir. 1998) (conservative treatment, including exercises and medication, and lack of surgery supported ALJ's adverse credibility determination). And, there are inconsistencies in the record, e.g., Plaintiff first reported that the prednisone helped a lot and then, in the same appointment, described it as helping a little, at best. See **Wheeler v. Apfel**, 224 F.3d 891, 895 (8th Cir.

2000) ("The ALJ may discount subjective complaints of pain if inconsistencies are apparent in evidence as a whole.").

Recognizing that Plaintiff described activities of daily living significantly limited by her impairments, the ALJ discounted her description for the same reasons advanced in **Whitman v. Colvin**, 762 F.3d 701 (8th Cir. 2014). In that case, the ALJ discounted the claimant's allegations of limited daily activities on the grounds that the activities could not be objectively verified and that, even if they were as restricted as alleged, the degree of limitation could not be attributed to his medical condition. **Id.** at 705. The court deferred to the ALJ's credibility finding. **Id.** at 707-08. Similarly, in the instant case, because the ALJ's determination not to credit Plaintiff's subjective complaints is supported by good reasons and substantial evidence, the Court defers to her determination. See **McDade v. Astrue**, 720 F.3d 994, 998 (8th Cir. 2013); **Renstrom**, 680 F.3d at 1065.

Fibromyalgia. Noting that the Eighth Circuit has recognized that fibromyalgia is an elusive diagnosis, see **Tilley v. Astrue**, 580 F.3d 675, 681 (8th Cir. 2009), Plaintiff argues that the ALJ failed to consider how her fibromyalgia affects her RFC.

"[F]ibromyalgia is a chronic condition which is difficult to diagnose and *may* be disabling." **Pirtle v. Astrue**, 479 F.3d 931, 935 (8th Cir. 2007) (emphasis added). See also **Forehand v. Barnhart**, 364 F.3d 984, 987 (8th Cir. 2004) ("We have long recognized that fibromyalgia has the *potential* to be disabling.") (emphasis added). The diagnosis itself does not establish disability, as is evident from the diagnosis first appearing in Plaintiff's June 2009 medical record – twenty-eight months before her alleged disability onset date. And, unlike

the ALJ in <u>Tilley</u>, the ALJ did address her fibromyalgia and found her to have several resulting physical limitations.

    <u>The VE's Testimony.</u>  In her fourth, and final claim of error, Plaintiff argues that the implausibility of someone having to hourly use the restroom and change positions being able to stay productive in an unskilled job is so evident that the ALJ erred by accepting the VE's testimony that there are jobs that such a person can perform.

    "Under Social Security Ruling (SSR) 00–4p, the ALJ must 'ask about any possible conflict' between VE evidence and 'information provided in the DOT.'"  **Moore v. Colvin**, 769 F.3d 987, 989 (8th Cir. 2014).  "If there is an 'apparent unresolved conflict' between VE testimony and the DOT, the ALJ must 'elicit a reasonable explanation for the conflict' and 'resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than on the DOT information.'"  **Id.** at 989-90 (quoting Social Security Ruling 00–4p, 2000 WL 1898704, at *2–4 (S.S.A. Dec. 4, 2000)).

    Ms. May stated that her testimony was consistent with the DOT.  Additionally, she noted that the DOT does not refer to a sit/stand option – requirement of Plaintiff.  She further testified, however, that her experience as a rehabilitation counselor for twenty years informed her testimony that two of the three cited jobs, laundry worker and collator, allow for sitting and standing at will and the third, an office helper, allows for a worker to move about more freely.  She also testified that none of these three jobs would be eliminated if a person needs to briefly use the restroom.  Asked to support her conclusions about the described

accommodations, Ms. Mays cited her extensive experience as a rehabilitation counselor. Plaintiff did not challenge that explanation.

Carefully reviewed, Ms. Mays' testimony does not present the implausible situation described by Plaintiff. She testified that the three jobs allow for a person to alternate positions. This is not the same as a person taking time away from her work station to alternate positions. The VE testified that a person could briefly use the restroom every hour. This does not lessen a person's productivity below 90 percent.

"When an ALJ has posed a hypothetical that accurately reflects [her] RFC finding, questioned the VE about any apparent inconsistencies with the relevant DOT job descriptions, and explained [her] decision to credit the VE's testimony, the ALJ has complied with SSR 00–4p, and [the Court] review[s] [her] decision under the deferential substantial evidence standard." **Welsh v. Colvin**, 765 F.3d 926, 930 (8th Cir. 2014). In the instant case, any apparent inconsistencies were inquired about and addressed. The ALJ's determination that Plaintiff can perform the three jobs cited by the VE is supported by substantial evidence on the record as a whole.

### Conclusion

Considering all the evidence in the record, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED

and this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  19th  day of May, 2015.